**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| LAMSON & SESSIONS CO. ET AL., ) | CASE NO.4:08CV1226 |
| ) | |
| Plaintiff, ) | JUDGE CHRISTOPHER A. BOYKO |
| ) | |
| Vs. ) | |
| ) | |
| WILLIAM D. MUNDINGER, ET AL., ) | OPINION & ORDER |
| ) | |
| Defendant. ) | |

**CHRISTOPHER A. BOYKO, J:**

This matter comes before the Court upon the Court's *sua sponte* inquiry regarding the propriety of Jones, Day, Reavis & Pogue's ("Jones Day") continued representation in this bankruptcy adversarial proceeding of Plaintiff The Lamson & Sessions Co. ("Lamson"). Per the Court's order, the parties have briefed the issue of whether Jones Day's previous representation of YSD Industries, Inc. ("YSD") ethically precludes Jones Day from representing Lamson in this adversarial proceeding, necessitating Jones Day's disqualification. For the following reasons, Jones Day will not be disqualified from further representation of Lamson in this matter.

**I.  FACTS[1]**

The debtor, YSD, is a closely held corporation whose shareholders at the time of this action were Defendants William Mundinger ("Mundinger") and William Peters ("Peters"). At

---

[1]  The parties have inconsistently denominated themselves throughout the pleadings in this case, sometimes adopting the designations of bankruptcy terminology and other times that of a standard proceeding. This opinion adopts the standard designations of "plaintiff" and "defendant."

1

all relevant times, Mundinger and Peters also acted as officers and directors of YSD. YSD was previously a wholly-owned subsidiary of Plaintiff Lamson until 1988, when Lamson sold YSD to Mundinger, Peters, and several others. Lamson's usual outside counsel, including matters involving YSD, is the law firm of Jones Day. YSD's usual outside counsel is the law firm of Henderson, Covington, Messenger, Newman & Thomas Co., L.P.A. ("Henderson Covington").

As part of the sale of YSD to Mundinger and Peters, Lamson required YSD to assume liability for various obligations to YSD's employees and retirees, as well as liability for certain asbestos claims. Guarantees and indemnification provisions are included in the Purchase Agreement and Settlement Agreement in which YSD assumed these obligations. The meaning and applicability of certain of these guarantees and indemnities are among the contested issues in this case.

In late 2001, YSD was informed that its insurer, Anthem, was demutualizing and, as a result, YSD would receive a large amount of stock in Anthem. YSD, unsure of the consequences of this windfall, contacted its normal counsel, Henderson Covington. YSD's regular attorney at Henderson Covington, James Messenger, advised YSD that Henderson Covington did not have the requisite experience in insurance demutualization and that YSD should seek specialized outside counsel. Mundinger, through his previous association with Lamson, knew several attorneys at Jones Day and YSD had previously retained a Jones Day labor attorney, James Rydzel ("Rydzel"), to advise on and negotiate a switch between Medicaid plans for employees and retirees. Presented with the need for specialized counsel for the Anthem demutualization, YSD again sought the advise of Rydzel. In turn, Rydzel enlisted the aid of another Jones Day attorney, Mary Maloney ("Maloney"), who specialized in the field of ERISA. Cognizant of the

2

ongoing relationship between its longtime client, Lamson, and YSD, Jones Day drafted and obtained Mundinger's signature on an engagement letter that limited the scope of the representation to the consequences of the demutualization, clarified that YSD alone was the client, attempted to waive potential future conflicts between YSD and Lamson as clients, and stated that the representation could only be expanded with Jones Day's consent.

Rydzel and Maloney researched the issues involved with the demutualization and advised YSD that some of the proceeds of the demutualization belonged to employees and retirees who paid premiums to Anthem. Rydzel and Maloney advised that the employees' and retirees' shares of the proceeds should be put into a separate account to be distributed to them, which they were. Rydzel and Maloney further advised that the remainder of the proceeds belonged to YSD and could be used for any purpose that YSD thought advisable.

Mundinger alleges that during the course of the representation he repeatedly informed Rydzel and Maloney that YSD intended to distribute YSD's share of the demutualization proceeds to its shareholders.  Mundinger alleges that Rydzel and Maloney had no problem with such a distribution and advised YSD to "go for it."  Rydzel and Maloney, meanwhile, claim that no such advice was sought or given and that they would never have rendered such advice because it was both beyond the scope of the representation and their competence as attorneys.

In addition to any alleged advice from Jones Day, YSD also consulted with Henderson Covington and YSD's accountants, Phil Dennison and the accounting firm of Packer Thomas & Co., regarding the propriety of the shareholder distributions.  Both Henderson Covington and the accountants gave the distributions a green light.  Thus, in July and October 2002, YSD made distributions of the demutualization proceeds and other assets to its shareholders, Mundinger and

3

Peters. At various other times YSD allegedly made other distributions or transfers to Mundinger and Peters as well.

Sometime in the Spring of 2003, YSD could no longer meet all its debt obligations, including those contained in the Settlement and/or Purchase Agreements. As a result, Lamson was forced to pay the obligations it had guaranteed. In July 2004, Lamson filed suit in the Cuyahoga County Court of Common Pleas, asserting breach of contract by YSD and fraudulent transfers, breach of contract via alter-ego liability, and unjust enrichment against Mundinger and Peters. Lamson's allegations included assertions that YSD was either insolvent at the time of shareholder distributions made to Mundinger and Peters or that such transfers and distributions rendered YSD insolvent and unable to meet its obligations and debts. In June 2005, YSD filed for bankruptcy under Chapter 7 and Lamson's suit was removed to the United States Bankruptcy Court for the Northern District of Ohio as an adversary proceeding. The bankruptcy trustee ("Trustee") successfully moved to substitute himself for certain of Lamson's claims, but the alter-ego breach of contract and unjust enrichment claims against Mundinger and Peters were left as personal claims of Lamson.

The adversarial proceeding then came before this Court for resolution. During the case management process and briefing of the case, allegations regarding Jones Day's previous representation of YSD during the Anthem demutualization came to light. Therefore, the Court ordered the parties to brief the issues related to the ethical considerations of Jones Day's continued representation of Lamson in this matter, including conflicts of interest under the professional rules and whether Jones Day should be disqualified for violations of those rules.

## II. LAW AND ANALYSIS

### A. Standard for Disqualification

The ethical standards prescribed by the Ohio Rules of Professional Conduct govern all attorneys practicing before this Court. "Attorneys admitted to practice in this Court shall be bound by the ethical standards of the Code of Professional Responsibility adopted by the Supreme Court of the State of Ohio, so far as they are not inconsistent with federal law." Local Rule 83.7(a), U.S. District Court, Northern District of Ohio; *see also* Local Rule 83.5(b) & (f), U.S. District Court, Northern District of Ohio.

When an attorney violates the ethical standards set forth in the Ohio Rules of Professional Conduct, disqualification is one remedial measure the Court may employ. "The Court retains inherent authority to police the ethical conduct of the lawyers who appear before it and to uphold the ethical norms embodied in the Code of Professional Conduct." *United States v. Miller,* 624 F.2d 1198, 1201 (3rd Cir. 1980). Disqualification is appropriate "only when there is a 'reasonable possibility that some specifically identifiable impropriety' actually occurred and, in light of the interest underlying the standards of ethics, the social need for ethical practice outweighs the party's right to counsel of his own choice." *Kitchen v. Aristech Chemical,* 769 F. Supp. 254, 257 (S.D. Ohio 1991) (quoting *United States v. Kitchin*, 592 F.2d 900, 903 (5th Cir. 1979). Disqualification of attorneys is a power "incidental to all courts, and is necessary for the preservation of decorum, and for the respectability of the profession." *Ex Parte Burr,* 22 U.S. 529, 531 (1824).

Indeed, the Court need not wait for one of the parties to raise the conflict or move to disqualify. "In cases where counsel is in violation of professional ethics, the court...may act sua

sponte to disqualify." *O'Connor v. Jones*, 946 F.2d 1395, 1399 (8th Cir. 1991); *accord United States v. Coleman*, 997 F.2d 1101, 1104 (5th Cir. 1993) ("district court had the authority and duty to inquire sua sponte into whether counsel should not serve because of a conflict with another client"); *Preston v. Atlas Casting & Techn.*, No. C08-5033BHS, 2008 WL 5000459, at *1 (W.D. Wash. Nov. 21, 2008) ("once the Court is on notice of a potential conflict of interest, it may disqualify an attorney sua sponte"); *United States v. Benacquista*, No. 08CR94A, 2008 WL 2371478, at *3 (W.D.N.Y. June 9, 2008) (mandatory nature of ethical rule "requires that the court be able to disqualify counsel sua sponte when the need arises"); *Yates v. Applied Performance Techs., Inc.*, 209 F.R.D. 143, 152, 154 (S.D. Ohio 2002) (sua sponte disqualifying attorney due to conflict of interest); *Cramer v. Chiles*, 33 F. Supp. 2d 1342, 1346 n.2 (S.D. Fla. 1999) (noting that plaintiff's previous counsel was disqualified by the court sua sponte); *Drywall Tapers and Pointers of Greater New York v. Local 530 of Operative Plasterers and Cement Masons Intern. Ass'n, AFL-CIO*, No. 93-CV-154 (JG), 1996 WL 1088933, at *8 (E.D.N.Y Oct. 24, 1996) (sua sponte disqualifying attorney who was potential witness in litigation); *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2008 WL 4018841, at *4 n.9 (Bankr. S.D.N.Y. Aug. 25, 2008); *In re Mount Vernon Plaza Cmty. Urban Redevelopment Corp. I*, 85 B.R. 762, 765 (Bankr. S.D. Ohio 1988) (court has "not only the right, but also the duty to insure [sic]" ethical practice as part of its "inherent power to supervise its own affairs"). *Cf. Wheat v. United States*, 486 U.S. 153, 160-161 (1988) ("Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them"); *Gen. Mill Supply Co. v. SCA Servs., Inc.*, 697 F.2d 704, 712 (6th Cir. 1982) (in determining whether attorney should be disqualified "the court should

sua sponte raise ethical problems involving danger to a just, speedy, and inexpensive remedy, even if the parties do not"). The weight of authority throughout the nation is clear; courts have an independent power and duty to root out unethical practices and may disqualify attorneys from representation to prevent ethical violations, regardless of the wishes of the parties.

Nonetheless, because "disqualification is a drastic measure...a violation of the Code of Professional Responsibility alone should not result in a disqualification, unless disqualification is found to be absolutely necessary." *Centimark Corp. v. Brown Sprinkler Serv., Inc.*, 85 Ohio App. 3d 485, 488-489 (Ohio App. Ct. 11th Dist. 1993); *accord Cliffs Sales Co. v. Am. S.S. Co.*, No. 1:07-CV-485, 2007 WL 2907323, at *2 (N.D. Ohio Oct. 4, 2007) ("a violation of the rules of professional responsibility does not automatically necessitate disqualification of an attorney"). Rather, when there is a conflict between the interests of a former client and a current client, "[a] three-part test for disqualification exists: (1) a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) the subject matter of those relationships was/is substantially related; and (3) the attorney acquired confidential information from the party seeking disqualification." *Dana Corp. v. Blue Cross & Blue Shield Mut. of Northern Ohio*, 900 F.2d 882, 889 (6th Cir. 1990).

The party seeking disqualification "bears the burden of demonstrating the need to disqualify counsel even though the allegation involves ethical considerations." *Centimark*, 85 Ohio App. 3d at 489. Unless the facts demonstrating a potential or actual conflict of interest are uncontested, a motion to disqualify usually requires a "careful inquiry," including a hearing. *United States v. Pena*, 81 F.3d 162 (Table), 1996 WL 145840, at *2 (6th Cir. 1996).

### B. Scope of the Court's Inquiry

Again, as *Centimark*, *Cliffs Sales*, and *Dana* all make clear, the scope of the Court's inquiry is not merely whether an ethical violation occurred, but also whether the violation is one which requires disqualification.  The first and second prongs of the *Dana* standard for disqualification are essential elements even to show that a *conflict* exists.  *See* Ohio Rule of Professional Conduct 1.9(a) (defining a former client conflict as one where the attorney had a previous attorney-client relationship with an adverse party in the "same or a *substantially related matter*").  In contrast, the acquisition of confidential information required by the third prong of the *Dana* standard for disqualification is not a necessary component of a former client conflict under Rule 1.9(a).[2]  Thus, the Court's inquiry may reveal a conflict under Rule 1.9(a), but not a conflict that mandates disqualification.  In that case, the Court is simply required to refer the matter to the Court's Committee on Complaints and Policy Compliance.  Local Rule 83.7(d)(1), U.S. District Court, Northern District of Ohio.

### C.  Jones Day Never Acquired Relevant Confidential Information

The third and, for purposes of this case, most crucial prong of the *Dana* test for disqualification is whether "the attorney acquired confidential information from the party seeking disqualification."  900 F.2d at 889.  Although a former client conflict may exist when there is merely a "substantial risk" that confidential information has been gained,[3] disqualification requires that confidential information has actually been acquired.

---

[2] Nonetheless, Rule 1.0(n) defines "substantially related matter" as including a scenario where there is "substantial risk" that confidential information adverse to the former client has been obtained.  In addition, Rule 1.9(c) sets out specific prohibitions on adverse use of confidential information gained in a former attorney-client relationship.

[3] *See* Rule 1.9; Rule 1.0(n).

8

As defined by the Ohio Rules of Professional Conduct "confidential information" is broader than simply that information covered by the attorney-client privilege and covers all "information relating to the representation." Rule 1.6(a). The parties do not appear to dispute the fact that Jones Day acquired *some* confidential information as a result of representing YSD; however, the parties disagree over whether the confidential information acquired by Jones Day is in any way *relevant* to the current litigation between Lamson and Mundinger and Peters. The discussion in *Morford v. Morford* illuminates the otherwise sparse and unyielding language of the *Dana* standard, stating, "The primary purpose of disqualification is to protect confidentiality of information, even if the information is only potentially involved in the current action." *Morford v. Morford*, 85 Ohio App. 3d 50, 57 (Ohio App. Ct. 4th Dist. 1993) (citing *In re Mount Vernon*, 85 B.R. at 764 (stating that disqualification is proper when attorney had access to "*relevant* privileged information") (emphasis added)). Thus, the key issue is whether any of the confidential information acquired by Jones Day is even *potentially* involved in the current action.

With regard to Jones Day's advice relating to the demutualization of Anthem, that information is not even potentially relevant to the current dispute. Lamson does not challenge the division of the demutualization proceeds between employees and retirees on the one hand and YSD on the other. Rather, Lamson is challenging YSD's distribution of the demutualization proceeds and other assets to the shareholders, claiming it was fraudulent and a breach of contract because it either was done when YSD was insolvent or made YSD insolvent. As such, confidential information relating to the ERISA, tax, and employee/retiree contract consequences of the division of demutualization proceeds is irrelevant and should not provide a basis for disqualification.

9

Because Lamson challenges the shareholder distributions and their effect on the solvency of YSD, only information relating to that would be relevant and grounds for disqualifying Jones Day. When the same attorney represents both the former and current client there is an unrebuttable presumption that the attorney gained confidential information, but if the conflict is only imputed through firm association then the presumption is rebuttable. *Campbell*, 2004 WL 2892884, at *4. Here, neither Rydzel nor Maloney represent Lamson in the current action and thus, Jones Day may rebut the presumption.

Jones Day has met its burden of rebutting the presumption that it acquired relevant confidential information. While Mundinger and Peters assert generally that confidential information was acquired by Jones Day, they fail to indicate the nature of that information. In contrast, Rydzel and Maloney both declared that they had no access to YSD's financial statements nor were they otherwise informed of YSD's financial situation. (Rydzel Decl. at 3; Maloney Decl. at 2). Upon the Court's order, Mundinger provided an affidavit detailing all dealings between Jones Day and YSD. (Mundinger Aff.) Mundinger's affidavit fails to show any relevant information regarding YSD's solvency which was acquired by Jones Day as a result of the demutualization representation. While the affidavit alleges that Mundinger and YSD were involved with attorneys from Jones Day at various other times during the past twenty years, it is clear from the affidavit that at all other times Jones Day was acting as counsel for Lamson not YSD; thus, any information gained in those dealings was not confidential information gained in an attorney-client relationship with YSD.[4] Because Mundinger and Peters failed to come

---

[4] The only potential allegation regarding information relating to the financial situation of YSD is that in late 2003 or early 2004, as part of an attempt to revive YSD's struggling business, YSD permitted "experts" from Lamson and a "turn around company,"

forward with evidence that Rydzel or Maloney acquired financial statements or other information *relevant* to YSD's financial solvency, the issue currently in dispute, it cannot be shown that Jones Day acquired the type of confidential information justifying disqualification.

### IV.  CONCLUSION

In conclusion, for the Court to disqualify Jones Day, it must find both a former client conflict and acquisition of relevant confidential information through the previous representation. There is no evidence Jones Day acquired confidential information that is relevant to the current litigation because Mundinger's affidavit does not state that financial or other relevant information was acquired.  Thus, the final prong of the *Dana* standard is not met and Jones Day will not be disqualified.

Given this resolution of the disqualification issue, it is not necessary for the Court to hold a hearing to take testimony and evaluate the credibility of the parties on other contested issues of fact bearing on waiver, existence of conflict, existence of an attorney-client relationship, or substantial relation of subject matters; those issues are moot.

Thus, Jones Day will not be disqualified and may continue to represent Lamson in this matter.

---

Stoney Point, to conduct an "extensive review" of YSD's business.  (Mundinger Aff. at 8).  As part of that process an attorney from Jones Day, William Coquelette, allegedly met with Mundinger, a member of Lamson's board, and the president of Stoney Point, to help negotiate a potential purchase of YSD.  *Id.*  It is clear, however, that Coquelette was counsel either for Lamson, Stoney Point, or both, but not for YSD.  Any information gained as part of the review of YSD's business was acquired by experts that Mundinger acknowledges were employed by Lamson and that YSD voluntarily allowed to review its records.  It is irrelevant whether Jones Day acquired any information through this process because, if so, the information was acquired from its current client, Lamson, not its former client, YSD.

**IT IS SO ORDERED**

<u>May 1, 2009</u>                                       <u>/s/ Christopher A. Boyko</u>
Date                                                   CHRISTOPHER A. BOYKO
                                                        United States District Judge